**J. RICH STEERS, Inc., v. PENNSYLVANIA R. CO.**

No. 12977.

District Court, E. D. New York.

Dec. 1, 1932.

Purdy & Purdy and Edmund F. Lamb, all of New York City, for libelant.

Burlingham, Veeder, Fearey, Clark & Hupper and Frederic Conger, of New York City, for respondent.

CAMPBELL, District Judge.

This is an action brought to recover for damages to a tug owned and operated by the libelant, alleged to have been damaged by the moving drawspan of a bridge owned and operated by the respondent.

I find the facts as follows:

At all the times hereinafter mentioned and at the time of the trial, the libelant was a domestic corporation, organized and existing under the laws of the state of New York.

At all of such times the libelant was the owner of the tug J. Rich Steers.

At all the times hereinafter mentioned and at the time of the trial, the respondent was a foreign corporation, organized and existing under and by virtue of the laws of the state of Pennsylvania.

The respondent was not within this district at the time the libel herein was filed, but had goods, chattels, property, credits, and effects within this district and within the jurisdiction of this court, to wit, certain tugboats, floats, barges, and other floating equipment subject to the jurisdiction of this court.

On December 19, 1931, the J. Rich Steers proceeded up the Passaic river with two loaded scows in tow. The first one she landed to the southward of the Commercial Dock, commonly called the Market Street Bridge, at Newark, N. J., the other she landed further up the river, and to do so she had to go through that bridge.

The place where the first scow was landed was a bulkhead where scows are tied up, and has been in use for that purpose for the last year and one-half.

This scow was landed outside of another scow and there was a light scow, H. S. No. 88, lying above and closer to the bridge than the tier including the scow he had just landed.

After landing the scow further up the river, the tug J. Rich Steers proceeded down the river, and as she approached the Market Street Bridge, gave a three-whistle signal for the bridge to open.

The bridge was not ready to open and gave the regulation two-blast signal.

The J. Rich Steers held back and subsequently the bridge gave the signal and proceeded to open the easterly end of the bridge opened up river to the north and the westerly or Newark end opened down river to the south.

The J. Rich Steers then proceeded down through the west draw until she was down by the scow she had landed on her way up the river, which was below and outside of the draw, and pulled partly alongside said scow in order to give a Tracy tug, the Alfred P. Brown, which had two coal boats in tandem tow, and had been behind the Steers, room to pass through the draw and get clear of the Steers.

A Tice tow, the Viatic, with one barge in tow, passed through the east draw at the same time as the Steers passed through the west draw.

The Tracy tow then lined up for the east draw and passed down through it behind the Viatic.

When the Steers observed that the Tracy tow was lined up for the east draw, the bridge was still fully open, and the Steers backed to get in position to pick up the H. S. No. 88, which was up above the end of the center pin abutment. When the Steers was

just below the end of the draw, it started to close. The Steers kept on backing without giving any signal, and the master of the Steers heard the whistles begin to blow, heard a crash, and then a crash on top of that. He immediately stopped the tug and looked out, saw that the smokestack was partly pushed over toward the starboard side and also toward the stern, and also that the flagpole was broken and knocked over toward the starboard side and toward the stern, and part of it lying overboard.

The No. 88 was lying in out of the channel clear of navigation, out of the path of the drawspan as it swung around, but extending up in the draw about 10 or 15 feet inside of the West abutment.

To pick up the No. 88 the Steers had to be in the draw in order to get alongside of her.

The Steers could without danger have picked up the No. 88 if she had waited for the drawspan to close before backing up into the draw.

The Steers had no lookout and the master at the wheel could not see the movement of the bridge as the drawspan closed, due to a permanent awning that extends all around the front of the pilot house where the windows are located.

No signals were blown by the Steers or the bridge after the opening signals.

The bridge may be opened either clockwise or contraclockwise, as it will describe a circle of 360 degrees.

There is a little house on the center pin where the engine room is located on the bridge. There is what is called the blind side of the engine room and no signals by hand are given from that end to the bridge operator, but the man at the other end of the drawspan signals the operator.

When the drawspan is being opened or closed there is a deckhand or bridge tender at each end of the drawspan, and on the day in question the blind side of the engine room was to the west and south. Castellano was the deckhand or bridge tender on that end. In case of an emergency the deckhand or bridge tender at the end on the blind side of the engine room can give a signal to the bridge operator by bell.

After the operator had opened the bridge, he went out on the platform by his engine room and saw the Steers, which was then lying alongside the loaded scow that she had previously landed, and which was below the center pin and outside of the draw.

The operator returned to the engine room and on receiving a signal from the bridge tender or deckhand on the east and north end of the draw, he commenced to close the drawspan following the Tracy tow.

When the drawspan had about one-half closed, Castellano saw the danger of the Steers, which by that time had backed up where the swinging wing of the drawspan in closing would endanger the Steers, and called out, signaled to the man at the outer end by hand, jumped on the bell signal, whereupon the drawspan was almost immediately stopped, but not before the damage had been done to the smokestack and flagpole of the Steers.

After that the Steers again dropped down alongside the loaded scow which she landed before she went through the bridge, and later left under her own power.

The Steers was in the habit of landing boats at the dock below the bridge, and her master was familiar with the draw and with the handling of the drawspan.

The rules relating to bridges on the Passaic river provide for no signals to be given by the bridge on closing.

The only signals provided for are by the boats desiring to pass through, and by the bridge when it cannot open, and when it can open.

The rules also provide: " * * * Nor shall water craft or vessels be so manipulated as to hinder or delay the operation of a drawspan, but all passage upon, through, or under a drawbridge shall be prompt to prevent delay to either land or water communication."

There is a sharp conflict as to the state of the tide at the time of the accident, but I believe the tide was flood.

From the facts as found, the tug J. Rich Steers appears to have been solely at fault.

This is not a case of signals not heard or misunderstood by the bridge, because it is conceded that the Steers gave none when she backed up into the draw, and in no way warned the bridge operator, tender or deckhands of her intention to go within the draw in the way of the drawspan.

The cases cited on behalf of the libelant are not in point.

The Steers had, after the bridge was opened in response to her signal, gone through the draw and clear of the drawspan, and below the center pin abutment which extended some distance below the end of the drawspan when opened.

The Steers then believing that she had time before the drawspan would close after

the Tracy boats had passed through, or else failing to take into account her position with reference to the drawspan, backed close to the swing of the drawspan before it started to close, and continuing to back found herself in the way of the closing drawspan, and received the injury to smokestack and flagpole.

The danger of the Steers was not apparent to the deckhand on the west end of the drawspan until after the bridge had started to close, as the continued backing of the tug brought her into danger at that time. Immediately upon observing the danger of the Steers he gave signals by mouth, hand, and bell, and the moving drawspan was stopped but not before the danger was done.

The master of the Steers could not see the danger from the moving drawspan and no efficient lookout was maintained on the Steers. This was a grievous fault as such lookout could have observed the danger and warned the master of the Steers, and it could have been avoided.

The time which it would have taken the Steers to perform the intended maneuver would have been more than it could reasonably have been expected that the bridge would remain open, to allow the Tracy tow to pass through, and the Steers had no right to interfere with the closing of the bridge without signaling for the bridge to remain open.

The Steers had gone through the bridge and beyond the center pin and no damage would have been done if she had waited but two or three minutes until the bridge had closed before attempting to go alongside of the light scow, which she did not intend to take through the bridge but to take down the river.

The master of the Steers must be in error when he says he had backed up and was coming ahead to go alongside the No. 88 at the time of the accident, because he had gone through the draw and below the center pin abutment, and waited alongside the scow he had landed before, to allow the Tracy tow to come through, and did not start to back until he found that the Tracy tug had lined up and was coming through the east draw, as but four minutes elapsed from the time the draw started to open until the time of the accident, and he could not have been backing up for one-half of that time before the accident.

That the Steers was not in a position which was considered dangerous by the bridge deckhand on the west end before the drawspan started to close, is clearly shown by the effort he made to stop the closing of the drawspan when he discovered the dangerous position in which the Steers had placed herself after the drawspan had started to close.

Of course, the bridge should not have been closed and the Steers damaged without warning, if those on the bridge knew that the Steers was in danger, but the evidence does not warrant any such finding.

The deckhand, Castellano, of the bridge was undoubtedly in error as to the distance backed by the Steers, but it is clearly shown by the deckhand of the Steers, Iverson, that she was backing when her smokestack and flagpole were struck, and from the distance the drawspan had moved and the time consumed in so moving, it is clearly established to my mind that the Steers was below the drawspan when she started to move, and that by continuing to back with the force of the tide, she brought herself within the swing of the closing drawspan.

The Steers put herself in a dangerous position without giving any signal of her intention to the bridge, and because of her failure to have a lookout, did not observe that the bridge was commencing to close, and do anything to aid in averting that danger.

It was not a fault of the bridge to close without giving a signal, in view of the fact that the Steers had come back into the draw after passing therethrough, without giving any signal. The Kearney (C. C. A.) 14 F. (2d) 949.

The theory on which the libelant now seeks to recover is certainly not that on which the libel was based, and in considering all of the evidence I am convinced that there is some error on both sides, and that the movement of the Steers immediately before the accident was as I have found.

I find as conclusions of law:

That the libelant has failed to show, by a fair preponderance of the evidence, that the respondent, its agents, servants, or employees were guilty of any negligence in the operation of its drawbridge on the day and at the time in question, or that the tug J. Rich Steers, at the time and place in question, received any damage by reason of the negligence of the respondent, its agents, servants or employees.

That any damages suffered by the steam-tug J. Rich Steers at the time and place in question were caused by the negligent navigation of the said steamtug J. Rich Steers by the libelant, its agents, servants, or employees, who were wholly at fault.

The respondent is entitled to a decree against the libelant, dismissing the libel with costs.

Settle decree on notice.

If this opinion is not considered a sufficient compliance with rule 46½ of the Rules in Admiralty (28 USCA § 723), proposed findings of fact and conclusions of law in accordance with this opinion may be submitted for the assistance of the court, as provided by the rules of this court.